# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

May 7, 2026

*Via CM/ECF*
The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

> Re:  *United States v. Angel Romero*
>      25 Cr. 478 (JPO)

Dear Judge Oetken,

Angel Romero briefly possessed a firearm as a prohibited person. He never brandished or used it, and nobody was ever in danger. Nor did Mr. Romero possess the gun for pecuniary gain or to commit another offense. Rather, he possessed it momentarily as a favor to another, while homeless and in the throes of a cocaine addiction. Mr. Romero's substance use disorder and lack of stable housing are serious, but not immutable, aspects of his life. Given this connection, fashioning a sentence that is sufficient but not greater than necessary to satisfy the Section 3553(a) factors compels the Court to avoid imposing a number that effectively punishes Mr. Romero for being a drug addict and experiencing homelessness. Rather, in balancing the Section 3553(a) factors, the Court should substitute a longer term of imprisonment with a more substantial period in a halfway house, where Mr. Romero can participate in outpatient drug treatment and reintegrate into society more deliberately and with more structure.

Mr. Romero was imprisoned from 2001 through January 2023 in New York State. His sentence stemmed from a rape charge against a minor, an allegation that he continues to vehemently deny.[1]

Mr. Romero's time in state prison was harrowing. Because he was convicted of rape, he was a target for other prisoners seeking to extort and assault him. Some prisoners even tried to kill him. Mr. Romero had to fight constantly to protect himself and suffered serious injuries. On one occasion, he almost died after someone struck him in the head with a metal pipe.

---

[1] It does not appear that the rape case against Mr. Romero involved much forensic evidence. Rather, Mr. Romero was convicted based largely on the testimony of the complainant and her mother. Mr. Romero has long maintained that the complainant's mother harbored a grudge against him and that she cajoled her daughter into fabricating sex assault accusations against him.

By the time he was released in January 2023, Mr. Romero had no support or safety net. He began living in shelters, which he continued to do until his arrest in this case on October 6, 2025. While he had some family and a few friends in New York City, including his girlfriend Maria Sebastian, nobody could help him obtain housing or a stable job. Unsurprisingly, it was not long before Mr. Romero began abusing cocaine again, a dependency he developed at 14 years old. While he worked here and there to sustain himself, Mr. Romero never had access to meaningful employment opportunities.

Given the totality of his circumstances and the lack of support available to Mr. Romero upon his release from state prison, providing Mr. Romero with medical and correctional treatment in the most effective manner militates against more imprisonment and instead weighs in favor of more sustained, deliberate, and structured oversight in the community. 18 U.S.C. § 3553(a)(2)(D). Accordingly, the defense respectfully requests that the Court sentence Mr. Romero to 18 months' imprisonment, followed by three years' supervised release, the first 12 months of which must be spent in a federal residential reentry center ("RRC").

## I.    Angel Romero's challenging upbringing and young adulthood.

Angel Romero was born on May 16, 1968, in Puerto Rico. Although they were never married, Mr. Romero's parents initially raised their children together in Carolina, Puerto Rico. When Mr. Romero turned 12, however, his parents split apart because of his father's infidelity. Mr. Romero's mother hated his father for cheating on her and refused to even let him in the house to see his children.

Mr. Romero's relationship with his father was complicated. While he taught Mr. Romero how to box, a life skill that Mr. Romero credits for keeping him alive all those years in prison, he also taught Mr. Romero how to train roosters for cock fighting, a bloody and dangerous activity that attracts all types of gambling and attendant illegality. Mr. Romero's father was also an alcoholic who physically abused Mr. Romero and his mother. Mr. Romero's father often beat him with a belt for perceived disrespect, however slight. He would get drunk and slap Mr. Romero's mother without provocation. When Mr. Romero was 14, he intervened and stood up to his father, finally ending the abuse.

14 was a difficult age for Mr. Romero. By then, he was already abusing heroin, cocaine, and marijuana. He was also struggling in school. Mr. Romero felt so despondent and pessimistic about his future that he tried to kill himself by cutting his left forearm. That same year, while in the ninth grade, Mr. Romero dropped out of school.

In 1985, by the time he was 17, Mr. Romero set out on his own and found himself living in the housing projects at Torres de Sabana, also known as "El

2

Castillo" (The Castle). Torres de Sabana has long been considered one of the most dangerous project housing blocks in Puerto Rico because it was a major epicenter for widescale drug trafficking and violence. Mr. Romero's experience in Torres de Sabana lived up to its reputation. In 1987, when he was 19, someone attacked Mr. Romero and tried to kill him. In defending himself, Mr. Romero was himself arrested and charged with attempted murder. He was sentenced to four years' imprisonment.

In 1997, Mr. Romero tried to restart his life and moved into an apartment building on Decatur Street in Brooklyn. The environment was not much better than Torres de Sabana, as Mr. Romero regularly witnessed shootings, stabbings, drug dealing, and even murders.

Mr. Romero's life in Brooklyn came to an abrupt halt when he was arrested and jailed in March 2001 on rape allegations. He was ultimately convicted after trial. For the next two decades, until January 2023, Mr. Romero was a ward of New York State. While imprisoned, Mr. Romero was regularly targeted by other prisoners because of his rape conviction. Sometimes, Mr. Romero had no other choice but to fight to defend himself. Over time, however, Mr. Romero learned how to exist in prison as a convicted sex offender and fly under the radar. Unfortunately, nothing about his incarceration prepared him for reentry. When he eventually returned to the community, Mr. Romero was lost.

Unfortunately, while in prison, Mr. Romero's father died in 2018. Mr. Romero's 74-year-old mother, Carmen Alicia Lattimer Ayuzo, lives in Brooklyn. Carmen and Mr. Romero enjoy a positive relationship, though Carmen's capacity to help Mr. Romero is very limited due to her own health challenges and reliance on social security income.

Mr. Romero has two full siblings, a brother and a sister. His brother, Luis, suffers from alcoholism and is currently in a treatment program. He suffers from liver damage. Mr. Romero's sister, Lisandra, lives in Brooklyn where she works hard as a home health aide for elderly and other homebound individuals. Mr. Romero also has two half siblings through his mother. One of them is dead and Mr. Romero does not keep in touch with the other. His family simply did not have the bandwidth to help him with his reentry to the community.

## II.  Given the totality of Mr. Romero's personal circumstances and those surrounding his offense, an 18-month sentence, followed by a year in an RRC as part of a three-year term of supervised release, is appropriate.

On August 11, 2025, Mr. Romero was homeless and addicted to drugs, and he purchased a very small amount of cocaine (much less than a gram) for personal use.

3

Police officers observed him doing so and arrested him. Subsequently, police searched Mr. Romero's backpack and found a firearm inside of it. At the precinct, Mr. Romero waived his *Miranda* rights and candidly explained that he agreed to bring the gun to another person as a favor, a decision that was the direct result of his cocaine dependence and reliance on a drug dealer to satisfy his addiction.

Mr. Romero was eventually released from state custody (after New York parole authorities permitted it) and he returned to a homeless shelter in the Bronx. He was later arrested by federal authorities on October 6, 2025, and charged with a violation of Section 922(g)(1) for his actions on August 11, 2025. A mere three months later, Mr. Romero appeared before this Court and readily accepted responsibility for possessing a firearm as a prohibited person.

Taken together, Mr. Romero's personal circumstances, the nexus between his drug addiction and the offense, and the need to provide him with medical and correctional reentry services in the most effective manner, Probation's recommendation for a 46-month-long sentence is plainly greater than necessary to achieve the statutory goals of sentencing. Probation's recommendation is also tethered to an improperly calculated U.S. Sentencing Guidelines range that reflects an inflated criminal history category and offense level.

## A.    Probation erred in calculating Mr. Romero's U.S. Sentencing Guidelines range.

In arriving at an adjusted offense level of 21, Probation concluded that Mr. Romero's base offense level is 20 under U.S.S.G. § 2K2.1(a)(4)(A) due to his prior first-degree rape conviction, added four levels under § 2K2.1(b)(7)(B) because it concluded he possessed the firearm in connection with another felony offense, and subtracted three levels for acceptance of responsibility under §§ 3E1.1(a) and (b). Although Probation correctly granted Mr. Romero a reduction for acceptance of responsibility § 3E1.1, his base offense level is really 14 because none of his prior rape convictions qualify as "crimes of violence" under U.S.S.G. § 4B1.2(a) (*see infra*). Further, the four-level enhancement under § 2K2.1(b)(7)(B) is inapposite and factually unsupported. Accordingly, Mr. Romero's properly calculated adjusted offense level is 12.

Regarding criminal history, Mr. Romero does not contest that his first-degree rape conviction earns him three criminal history points, placing him in category II under U.S.S.G. §§ 4A1.1(a) and 4A1.2(a)(2). However, Probation further assessed Mr. Romero three additional criminal history points under § 4A1.2(d), resulting in a criminal history category of III, because it concluded that Mr. Romero's three prior New York State convictions for second-degree rape, first-degree sodomy, and second-degree sodomy (which were part of the same charging instrument as the

4

first-degree rape conviction and not separated by an intervening arrest) constitute "crimes of violence" under § 4B1.2(a). This conclusion is wrong, and Mr. Romero's criminal history category is II. Accordingly, his guidelines range is actually 12 to 18 months' imprisonment.

       1. *The four-level enhancement under § 2K2.1(b)(7)(B) does not fit the facts of this case.*

Under U.S.S.G. § 2K2.1(b)(7)(B), a person convicted of possessing a firearm as a prohibited person is eligible for a four-level enhancement if the Government can prove by a preponderance of the evidence that the defendant "used or possessed any firearm or ammunition in connection with another felony offense [the "in-connection-with" clause]; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense [the "reason-to-believe" clause]." *See States v. Ryan*, 935 F.3d 40, 42 (2d Cir. 2019). Neither scenario fits the facts of this case.

*First*, by its terms, the "in-connection-with" clause only applies if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense. Put differently, "where the firearm's presence is merely coincidental," the enhancement does not apply. *Ryan*, 935 F.3d at 42.

Mr. Romero was initially arrested because he was observed purchasing a trace amount of cocaine for personal use. Under New York law, he could only have been convicted of N.Y. Penal Law § 220.03, criminal possession of a controlled substance in the seventh degree, a class A misdemeanor. *Compare* N.Y. Penal Law § 220.03, Criminal Possession of a Controlled Substance in the Seventh Degree (McKinney) *with* N.Y. Penal Law § 220.06, Criminal Possession of a Controlled Substance in the Fifth Degree (McKinney) (requiring cocaine weight to be five hundred milligrams or more). Under federal law, Mr. Romero could similarly only be convicted of misdemeanor possession under 21 U.S.C. § 844, which criminalizes simple possession of a controlled substance. Accordingly, Mr. Romero's possession of the firearm did not facilitate any *felony* drug offense.

In any event, Mr. Romero's possession of the gun was also wholly separate from his purchasing cocaine for personal use. As set forth in his post-arrest statement, Mr. Romero neither bought nor bartered for the gun, and the firearm was not displayed, discussed, or otherwise observed when he purchased cocaine. Because the firearm's presence was "merely coincidental" to Mr. Romero's purchase of cocaine, the four-level enhancement is inappropriate. *Ryan*, 935 F.3d at 42.

*Second*, the "reason-to-believe" clause also does not apply to Mr. Romero. All Mr. Romero did was possess a single firearm in a plastic bag with the intention of giving it to another person. There is no evidence that he was looking to sell the firearm, or that he had previously couriered firearms for pay or for any other purpose. At most, Mr. Romero had "reason to believe" that he was assisting another person in unlawfully possessing a firearm, a misdemeanor under N.Y. Penal Law § 265.01(1).

Crucially, Probation is wrong in claiming that Mr. Romero knew he was giving the gun "to a different drug dealer." PSR at ¶ 20.[2] This is pure speculation. During his post-arrest interrogation, the police asked Mr. Romero whether he knew the person who was supposed to receive the gun, a man named "El Indio." Mr. Romero responded that he did not know El Indio and had only seen him in the area. Without any evidence indicating Mr. Romero had purchased drugs from El Indio or was otherwise aware of his reputation as a drug dealer, there is no basis to believe Mr. Romero had a "reason to believe" El Indio's possession of a gun would be used in connection with a drug felony. Against this backdrop, the U.S.S.G. § 2K2.1(b)(7)(B) enhancement does not apply.[3]

---

[2] To the extent the Court believes that Mr. Romero knew that he was handing a firearm to El Indio in connection with a broader drug dealing conspiracy, the Court would then have to consider granting Mr. Romero a four-level mitigating role reduction under U.S.S.G. § 3B1.2. *See United States v. Hill*, 563 F.3d 572, 578 (7th Cir. 2009) (finding that the district court should have assessed defendant's eligibility for a mitigating role reduction when his "possession of the guns was one step in a longer sequence of events through which firearms were obtained by burglary and then sold to the CI"); *United States v. Reynolds*, 813 F. App'x 672, 677 (2d Cir. 2020) (distinguishing *Hill* because the defendant in *Reynolds* did not know the guns were stolen, and thus did not possess them "in furtherance of a broader criminal scheme").

[3] It is worth noting that many of the cases in which this enhancement applies concern circumstances eminently distinguishable from the facts of this case, including where the defendant is selling firearms to other prohibited persons and known drug dealers or using a firearm to commit some other crime. *See, e.g.*, *Ryan*, 935 F.3d at 43 (defendants sold shotgun to informant a week after they had sold the informant heroin packaged for individual sale); *United States v. Young*, 811 F.3d 592, 600 (2d Cir. 2016) (finding, after an evidentiary hearing, that defendant sold a large number of unusually dangerous weapons—AK-47s and TEC-9s—to people he knew to be drug dealers); *United States v. Mitchell*, 328 F.3d 77, 83 (2d Cir. 2003) (defendant sold numerous cheap, small, and easily-concealed handguns to individual he had seen with several pounds of marijuana and crack cocaine); *United States v. Martin*, 78 F.3d 808, 811–12 (2d Cir. 1996) ("The large number of guns involved, the types of weapons, and the unusual circumstances surrounding their purchase all indicated that the guns were being acquired for resale.").

*2. Mr. Romero's prior rape and sodomy convictions do not categorically qualify as "crimes of violence" under U.S.S.G. § 4B1.2(a).*

Because Mr. Romero's rape and sodomy convictions were for offenses that do not categorically require the use of force against another and otherwise penalize conduct beyond the Guidelines' definition of a "forcible sex offense," Mr. Romero's base offense level is 14 and his criminal history category is II.

U.S.S.G. § 4B1.2(a) defines a "crime of violence" as any state or federal felony that "(1) has as an element the use, attempted use, or threatened use of physical force against the person of another [the "force clause"]; or (2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm [the "enumerated offense clause"]."

To determine whether a prior conviction qualifies as a crime of violence, the Second Circuit uses the "categorical approach" prescribed by the Supreme Court in *Taylor v. United States*, 495 U.S. 575, 600 (1990). Under this abstract approach, courts must consider the elements of the prior conviction and determine whether the least culpable conduct fits within the generic definition set forth in the Guidelines. *Id.* at 598. In doing so, courts must ignore the circumstances of the defendant's crime and ask instead what is "the minimum criminal conduct necessary to sustain a conviction under the relevant statute." *Singh v. Barr*, 939 F.3d 457, 462 (2d Cir. 2019) (cleaned up). "[O]nly if the statute's elements are the same as, or narrower than, those of the generic offense does the prior conviction serve as a predicate offense for a sentencing enhancement." *United States v. Castillo*, 896 F.3d 141, 149-50 (2d Cir. 2018) (cleaned up). In other words, courts can "identify the minimum criminal conduct necessary for conviction under a particular statute by looking only to the statutory definitions— i.e., the elements—of the offense." *United States v. Pastore*, 83 F.4th 113, 118 (2d Cir. 2023), *aff'd sub nom. Delligatti v. United States*, 604 U.S. 423 (2025) (internal quotation marks and citations omitted).

Sometimes, a statute is divisible along its various subsections because it "sets out one or more elements of the offense in the alternative." *Descamps v. United States*, 570 U.S. 254, 257 (2014). Accordingly, in determining whether a prior conviction under a divisible statute qualifies as a "crime of violence," courts must engage in the "modified categorical approach." *United States v. Peña*, 762 F. App'x 34, 37-38 (2d Cir. 2019). When applying the modified categorical approach, a district court may consult a circumscribed set of documents relating to the defendant's prior conviction to ascertain whether his guilty plea or conviction "necessarily admitted

7

facts demonstrating that his conviction was for a crime of violence." *United States v. Reyes*, 691 F.3d 453, 458 (2d Cir. 2012) (internal quotation marks and brackets omitted). The district court's inquiry is "limited to the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." *Shepard v. United States*, 544 U.S. 13, 26 (2005).

In this case, even assuming that Mr. Romero's prior rape and sodomy convictions are for divisible offenses, a point that the defense does not concede, the defense is not aware of any *Shepard*-approved documents setting forth the particular subsection of each offense at issue. Rather, the only documents available are Mr. Romero's rap sheet and the PSR, neither of which constitutes a "judicial record" of the specific subsection that the jury unanimously agreed on to convict Mr. Romero. *See generally Shepard*, 544 U.S. at 16 (noting that police reports or complaint applications do not suffice); *Peña*, 762 F. App'x at 37-38 (explaining why the PSR cannot serve as the basis for a district court's "crime of violence" determination under the modified categorical approach). Accordingly, the Court must treat the statutes forming the basis for Mr. Romero's prior convictions as indivisible and determine whether any subsection of the respective statutes sweeps more broadly than the force or enumerated clause definitions of a "crime of violence." Because the statutes at issue plainly criminalize conduct beyond the reach of §§ 4B1.2(a)(1) and (a)(2), none of them qualify as crimes of violence.

> a.  *The statute underlying Mr. Romero's first-degree rape conviction, N.Y. Penal Law § 130.35, criminalizes conduct beyond the reach of § 4B1.2(a).*

Under N.Y. Penal Law § 130.35, a person is guilty of first-degree rape when he engages in vaginal, oral, or anal sexual contact with another person:

- By forcible compulsion; or
- Who is incapable of consent by reason of being physically helpless; or
- Who is less than eleven years old; or
- Who is less than thirteen years old and the actor is eighteen years old or more.

With respect to the force clause definition of a "crime of violence" under § 4B1.2(a)(1), three of the means of committing first-degree rape in New York do not categorically require the "use, attempted use, or threatened use of physical force against the person of another" because they criminalize sexual contact with a

person unable to consent due to age or incapacity. But even if the Court were to determine that Mr. Romero was convicted of first-degree rape by "forcible compulsion" under the modified categorical approach, which it cannot on the present record, New York's definition of "forcible compulsion" also does not satisfy § 4B1.2(a)(1) because it can be accomplished through threats of self-harm and kidnapping.

Under N.Y. Penal Law § 130.00(8), "forcible compulsion" means to compel by either:

- Use of physical force; or
- A threat, express or implied, which places a person in fear of immediate death or serious physical injury to himself, herself, or another person, or in fear that he, she, or another person will immediately be kidnapped.

Thus, although one way to accomplish "forcible compulsion" requires the use of physical force, another means of doing so contemplates threats of self-harm—*i.e.*, a person commits first-degree rape by forcibly compelling another to engage in sexual contact by threatening to commit suicide. This plainly does not require a threat to use force against another person.

Judge Garnett's recent decision in *United States v. Mangione* is instructive. No. 25-CR-00176 (MMG), 2026 WL 251490, at *17 (S.D.N.Y. Jan. 30, 2026). There, Judge Garnett considered whether offenses under 18 U.S.C. § 2261A, the federal stalking statute, qualify as "crimes of violence" under 18 U.S.C. § 924(c)(3)(A), which similarly defines a crime of violence as the use of force against the person or property of another. An element of 18 U.S.C. § 2261A requires the defendant to engage in conduct that causes "reasonable fear." Judge Garnett reasoned that § 2261A's "reasonable fear element could be satisfied by a threat to inflict self-harm, which cannot satisfy the requirement for use of force "against the person or property <u>of another</u>" in 18 U.S.C. § 924(c). *Mangione*, 2026 WL 251490, at *17 (emphasis in original). *See also, e.g.*, *United States v. Juvenile B*, 147 F.4th 837, (8th Cir. 2025) ("whereas § 16(a) requires that the offense have 'as an element the use, attempted use, or threatened use of physical force against the person or property *of another*,' the language 'any person' in § 2241(a)(2) means it can be violated by the threatened use of physical force against the defendant's own person") (cleaned up).

Alternatively, forcible compulsion can also be accomplished "by a threat, express or implied, which places a person … in fear that he or she or another person will immediately be kidnapped." However, a threat that places an individual in fear that, *e.g.*, someone they love will be kidnapped does not require the use or

9

threatened use of physical force under New York law. *See United States v. Eldridge*, 63 F.4th 962, 965 (2d Cir. 2023) (second-degree kidnapping under New York law was not a "crime of violence" because a person could be convicted if he used "deception to hold a victim in a place where it is unlikely that victim will be found").

In addition to not satisfying the force clause definition under § 4B1.2(a)(1), N.Y. Penal Law § 130.35 also does not fit within the definition of a "forcible sex offense" under § 4B1.2(a)(2). As set forth above, a person can commit first-degree rape in New York if he is over 18 and engages in sexual contact with a minor younger than 13. However, under § 4B1.2(e), offenses involving the sexual abuse of a minor fall within the definition of a "forcible sex offense" only if they fit within the definition of aggravated rape as defined by 18 U.S.C. § 2241(c), which proscribes sex with minors 12 years or younger. Accordingly, first-degree rape in New York sweeps more broadly than the definition of a forcible sex offense under § 4B1.2(a)'s enumerated clause.

> b. *N.Y. Penal Law § 130.50, first-degree sodomy, is not a crime of violence.*

Like first-degree rape under New York law, a person is guilty of first-degree sodomy in New York under N.Y. Penal Law § 130.50 if he engages in anal or oral sexual contact with another person:

- By forcible compulsion; or
- Who is incapable of consent by reason of being physically helpless; or
- Who is less than eleven years old; or
- Who is less than thirteen years old and the actor is eighteen years old or more.

The only apparent difference between first-degree rape and first-degree sodomy under New York law is that first-degree rape also covers vaginal sexual contact. Accordingly, first-degree sodomy is not a crime of violence under § 4B1.2(a) for the same reasons why first-degree rape does not qualify.

> c. *Second-degree rape under N.Y. Penal Law § 130.30 sweeps more broadly than § 4B1.2(a).*

At the time of Mr. Romero's conviction, the elements of second-degree rape under N.Y. Penal Law § 130.30 were that (1) the defendant engaged in sexual intercourse with the complainant; (2) the defendant was eighteen years old or more; (3) the complainant was less than fifteen years old. *See* N.Y. Penal Law § 130.30,

*effective February 1, 2001 to August 31, 2024* (McKinney); New York State Jury Instructions for Rape in the Second Degree.

On its face, second-degree rape does not categorically require "the use, attempted use, or threatened use of physical force against the person of another," rendering the force clause inapplicable. Nor does the statute describe a "forcible sex offense" under § 4B1.2(a)(2). As discussed above, sexual abuse of a minor or statutory rape only qualifies as a forcible sex offense if the conduct fits within 18 U.S.C. § 2241(c), which criminalizes knowingly engaging in a sex act with someone who is 12 years old or younger. In contrast, second-degree rape plainly applies if a person over 18 has sexual intercourse with someone 15 or younger. Because second-degree rape criminalizes conduct that 18 U.S.C. § 2241(c) does not, it is not a crime of violence under § 4B1.2(a)(2).

> d. *Second-degree sodomy under N.Y. Penal Law § 130.45 also sweeps more broadly than § 4B1.2(a).*

Like second-degree rape in New York, second-degree sodomy requires proof that (1) the defendant engaged in deviate sexual intercourse with the complainant; (2) the defendant was eighteen years old or more; and (3) the complainant was less than fifteen years old. N.Y. Penal Law § 130.45. Thus, also like second-degree rape, second-degree sodomy is not a crime of violence because there is no force element and it proscribes a broader range of sexual contact with minors than that covered by 18 U.S.C. § 2241(c).[4]

> e. *Mr. Romero's prior convictions under NYPL §§ 130.30 and 130.45 are not countable because they fall outside the applicable time period.*

U.S.S.G. § 4A1.2(e) instructs that only prior sentences "imposed within fifteen years of the defendant's commencement of the instant offense" or that "resulted in the defendant being incarcerated during any part of such fifteen-year period" should be counted. Further, "for purposes of determining predicate offenses, a prior sentence included in the single sentence should be treated as if it received

---

[4] Further, under 18 U.S.C. § 2241(c), the definition of "sexual act" encompasses "(a) contact between … the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration" and "(d) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(2). Under N.Y. Penal Law § 130.45, however, the definition of "deviate sexual intercourse" includes *any* contact between the penis and the anus, as well as any touching of the victim by the actor, whether directly or through clothing. N.Y. Penal Law §§ 130.00(2)-(3); (10), *effective February 1, 2001 to October 31, 2003* (McKinney); *see also, supra*. N.Y. Penal Law § 130.45 therefore criminalizes a wide range of conduct, including non-penetrative, through-clothing sexual contact that 18 U.S.C. § 2241(c) does not.

criminal history points, if it independently would have received criminal history points." U.S.S.G. § 4A1.2 cmt. n.3.

Given these parameters, and regardless of whether they qualify as crimes of violence, Mr. Romero's prior second-degree rape and second-degree sodomy convictions are not countable under § 4A1.1(d) because they fall outside the fifteen-year look-back period. Both offenses are Class D felonies in New York, subject to a seven-year maximum prison term (and Mr. Romero was sentenced to two-to-seven years' imprisonment for each offense). By the time Mr. Romero possessed a firearm in August 2025, more than 15 years had passed since he served his sentence for each of these offenses. Because both offenses would not have independently counted for criminal history points under § 4A1.2, Probation improperly included them in its criminal history calculation. U.S.S.G. § 4A1.2 cmt. n.3.

## B.    Even if the Court uses Probation's Guidelines, the Court should still vary downward to 18 months.

Even if the Court determines that Probation accurately calculated Mr. Romero's offense level and criminal history category, a downward variance to 18 months is appropriate.

When calculating a sentence, the Court "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 39 (2007). Indeed, the Court has the authority and discretion to "vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses." *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (noting that "some Guidelines enhancements and reductions apply without modulation to a wide range of conduct"). Here, a downward variance is warranted because the added criminal history points and offense-level enhancement are unjust.

The added criminal history points over-represent Mr. Romero's criminal history. Prior to the 2025 Amendments to the Guidelines, courts were permitted to apply "downward departures" from the Guidelines range. The removal of departures from the Guidelines Manual "does not reflect a determination by the Commission that the rationale underlying the deleted departure provisions is no longer informative or that a court should no longer consider such facts for purposes of determining the appropriate sentence." U.S.S.G. App'x B, Part III. Rather, "it is the Commission's intent that judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a

variance under 18 U.S.C. § 3553(a)."*Id.* In the context of criminal history, sentencing courts had the ability to find "horizontal departures"—i.e. reductions in a defendant's criminal history category—if "a defendant's criminal history category significantly over-represents the seriousness of [his] criminal history or the likelihood that the defendant will commit future crimes." *United States v. Mishoe*, 241 F.3d 214, 218 (2d Cir. 2001) (citation omitted); U.S.S.G. App'x B, Part III § 4A1.3.

Per Probation's calculation, Mr. Romero has six criminal history points, all stemming from one course of conduct from 2001. Adding points from U.S.S.G. § 4A1.1(d) essentially punishes Mr. Romero as if he committed three additional, separate felonies. The reality is that Mr. Romero committed one offense, unrelated to firearms, 25 years ago. Therefore, a six-point criminal history score overstates the extent of his criminal history and the likelihood of recidivism, justifying a variance.

Courts are also authorized to apply a downward variance based on a disagreement with the fairness of an offense-level enhancement. *See United States v. Stewart*, 590 F.3d 93, 142 (2d Cir. 2009). Here, even if proper, applying the four-level enhancement under § 2K2.1(b)(7)(B) to Mr. Romero is unfair. There was no non-speculative reason for Mr. Romero to believe that the firearm would be used in connection with another felony offense. The enhancement essentially provides for extra punishment for Mr. Romero based on the possibility that someone would use it to commit a felony unrelated to Mr. Romero. This unjust inflation of Mr. Romero's guidelines range compels a downward variance.

Further, a downward variance to 18 months' imprisonment is also necessary to account for other factors under 18 U.S.C. § 3553(a).

*First*, as to punishment, Mr. Romero has had to serve his pre-trial detention inside MDC Brooklyn, a facility that has long been "dirty" and "infested with drugs," and plagued with "violence." *United States v. Moran,* 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), Doc. 90, Tr. 12:25-15:21, 37:15-18. Judge McMahon once described the jail "as disgusting [and as] inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that." *United States v. Days*, 19 Cr. 619 (CM) (S.D.N.Y. Apr. 29, 2021), Doc. 35, Tr. 19:17-20. These conditions have worsened over the past few years, with multiple individuals having been killed or dying. *See, e.g.*, L. Fadulu, N.Y. Times, *Inmate Dies After Fight Breaks Out at Troubled Brooklyn Jail*, (July 17, 2024).[5] Indeed, in

---

[5] Available at: https://www.nytimes.com/2024/07/17/nyregion/inmate-dies-metropolitan-detention-center.html.

an opinion issued at the beginning of 2024, Judge Furman described in detail how the facility's "dreadful" conditions negatively impact the lives of those unfortunate enough to be housed there. *United States v. Chavez*, 710 F. Supp. 3d 227, 233 (S.D.N.Y. 2024).

To be sure, the defense acknowledges that BOP and the Government have undertaken significant efforts to fix MDC Brooklyn since *Chavez*'s publication, and that Judge Furman observed last year that conditions at the facility are "a lot better than when I wrote my opinion in *United States v. Chavez*." *United States v. Reshard*, 24 Cr. 392 (JMF) (S.D.N.Y. May 14, 2025), Doc. 38, Tr. at 24:11-24. However, in making that observation, Judge Furman simultaneously noted that MDC Brooklyn "has still much need for improvement," leaving undisturbed his decision in *Chavez*, which remains persuasive.

*Second*, a term of imprisonment longer than 18 months would not meaningfully advance general or specific deterrence. As to specific deterrence, Mr. Romero's swift acceptance of responsibility and affirmative request to spend a year inside a residential reentry center as part of a three-year term of supervised release proves that he is committed to not recidivating. And as to general deterrence, a sentence longer than 18 months is neither necessary nor effective. Instead, to achieve the aim of general deterrence, "social science conclusively finds that certainty matters more than severity." Brian Jacobs, *The Cost of Affording Deterrence*, Forbes (Nov. 16, 2021).[6] "[T]he vast majority of people who are committing crime are not particularly forward-looking. So adding five or ten years to an already long prison sentence simply doesn't have much of an effect on their behavior today." *Id.* In a bulletin by the National Institute of Justice, the U.S. Department of Justice echoes, "Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment." U.S. Department of Justice, *Five Things About Deterrence* 1, National Institute of Justice (May 2016).[7] "Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes." *Id.*

Here, that Mr. Romero was swiftly apprehended, prosecuted, convicted, and sentenced to prison, a halfway house, and a lengthy term of post-release supervision would be proof positive to any onlooker that committing gun crimes will result in decisive and serious punishment.

---

[6] Available at: https://www.forbes.com/sites/insider/2021/11/16/the-cost-of-affording-deterrence/?sh=6f8975277bd4.
[7] Available at: https://www.ojp.gov/pdffiles1/nij/247350.pdf.

14

*Third*, an 18-month sentence would prevent unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(6). Over the years, judges in the SDNY, including this Court, have imposed 18-month-long sentences on defendants convicted of violating Section 922(g)(1) with comparable, and in some cases greater, guidelines ranges. For example:

- In *United States v. Malachi Celestine*, 25 Cr. 321 (ER), Judge Ramos imposed a sentence of 18 months' imprisonment (varying from a guidelines range of 57 to 71 months) on a 26-year-old defendant with a traumatic background and mental illness who participated in a straw purchasing conspiracy as a prohibited person. Mr. Celestine's prior felonies were all firearm offenses. In addition to the federal offense, the defendant was also convicted in state court and sentenced to a term of one-and-a-half to three years. Judge Ramos ordered the sentence he imposed to run concurrently with the defendant's state sentence.
- In *United States v. Christopher White*, 24 Cr. 300 (DEH), Judge Ho sentenced the defendant to 18 months' imprisonment varying from a guidelines range of 37 to 46 months. The defendant was on state probation at the time he possessed a firearm as a prohibited person and had incurred numerous violations of his pre-trial release. He was arrested after fleeing from police and tossing the handgun mid-flight.
- In *United States v. Pedro Diaz*, 23 Cr. 630 (JPO), this Court sentenced the defendant to an aggregate term of 18 months' imprisonment varying from a guidelines range of 37 to 46 months, as calculated by Probation (which was greater than the parties' agreed-upon range of 30 to 37 months). The defendant was 43 years old, had an extensive rap sheet, and pleaded guilty to a violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) in addition to a violation of Section 922(g)(1).
- In *United States v. Melendez*, 21 Cr. 79 (KPF), Judge Failla sentenced the defendant to 18 months' imprisonment, varying from a guidelines range of 37 to 46 months. The defendant wielded a loaded gun in broad daylight and, while returning to his car, accidentally shot himself and his brother. He had been previously convicted of first-degree robbery and was on post-release supervision for that conviction when he was arrested for possessing a firearm as a prohibited person.

## Conclusion

Approximately three-and-a-half years ago, Mr. Romero was released from a decades-long prison sentence with no support system and few resources. While he made some positive strides and developed meaningful relationships, he struggled to

find his footing and succumbed to drugs. Balancing the need to punish Mr. Romero with the need to give him the kind of structure and support necessary to facilitate his meaningful and long-term reentry weighs in favor of a hybrid sentence—one that keeps him in prison for a little longer before easing his reintegration through a substantial period in a halfway house. For the reasons set forth above and for any apparent at Mr. Romero's sentencing hearing, the Court should sentence him to 18 months' imprisonment followed by three years' supervised release, the first year of which must be spent in a residential reentry center.

Respectfully submitted,

Andrew John Dalack, Esq.
Assistant Federal Defender
(646) 315-1527

Cc: AUSA Leslie Arffa

16